Counsel may begin whenever they're ready. Which case is going to be argued first? Reyes-Ponce. Okay. Thank you. Good morning. May it please the Court, my name is Keith A. McPhee. I am the counsel for Bibiano Reyes-Ponce. I was also trial counsel for Mr. Reyes-Ponce. I'd like to reserve two minutes for rebuttal time. Also, I have co-counsel here, so I'm only going to take ten minutes. My understanding is we have 20 minutes per side. Yes, that's correct. Thank you very much. Mr. Reyes-Ponce was convicted of a conspiracy, two counts, conspiracy to possess a controlled substance with intent to deliver, and a 924c possession of a firearm during a drug trafficking crime. I did not appeal his sentencing. He received the mandatory minimums under both the drug case as well as the gun case. So I'm here simply to argue that he should either receive a new trial or that the court should send a – well, that the court should reverse the denial of the Rule 29 motion to dismiss that that was done by the trial. Your basic argument is there is insufficient evidence to support the jury. That is correct.  That is correct. I want you to explain to us why there is insufficient evidence to support the jury. It's really a factual argument and concerns the facts of the case and whether, in fact, the government, quite frankly, with regard to the drug possession charge, was able to show that there was any knowledge on the part of Mr. Reyes-Ponce. How about the conspiracy part? He was charged with conspiracy. He was charged with conspiracy. And whether, in fact, he was a member of the conspiracy or not, I think, is also a factual consideration. So what is it about the evidence that's lacking? Knowledge. Knowledge. Plain and simple knowledge. The government – Knowledge of what? Of the presence of drugs in the van? That's correct. But he confessed to it. No, he did not confess to having knowledge of it. I explained to him that we had been conducting surveillance. We had been watching them, and we had seen drugs out of the van. And he then, Reyes-Ponce, changed his story and stated that Mr. Pineda had asked him to come along on the deal to make sure that nothing happened to Pineda. Now, doesn't that – Supplemental Excerpt 98. Doesn't that provide, under the Jackson case, sufficient evidence for a reasonable juror to infer that Reyes-Ponce knew about the drugs, he knew about the sale and the transfer of the drugs, that was the deal, and that he was there to protect Mr. Pineda? Game, set, and match. Game, set, and match only if you accept the preliminary premise by Agent Satchel, where Agent Satchel was convinced that the deal meant that it was a drug deal. Mr. Reyes-Ponce never admitted and continued to deny throughout the course of the proceedings and during a settlement conference that he had any knowledge about the drugs. He certainly admitted that. Yes, but isn't the context in which his confession occurred circumstantial evidence of his knowledge that there were drugs? Because in that exchange, he's told, we've been watching you guys, drugs came out of the van, and then he says, okay, I was part of this, I was there to protect this one individual. I don't understand why, in spite of his denial, there isn't sufficient circumstantial evidence for a rational jury to conclude that he was aware, that he knew of the drugs. Given all of the facts, and given what was known to the special agents at the time, there's no reason to conclude that he knew that there were going to be drugs in that van. There was no evidence presented whatsoever to show that Mr. Reyes-Ponce had any connection to that van other than he knew Mr. Saldivar-Pineda. There was no evidence to show that there was any agreement with Mr. Saldivar-Pineda or any of the other conspirators and Mr. Reyes-Ponce that they were going to participate in being what the government euphemistically called the muscle in a drug deal. There was no evidence to show that he knew that there was going to be a drug deal in the Azteca restaurant parking lot. So, I mean, yes, there's obviously an argument. What other meaning is there to the deal in the context of the agent's, special agent's testimony, when he said that your client told him, yes, he was asked to come along on the deal? What else could that have been? It could have been any number of things. It could have been that he knew that Mr. Saldivar-Pineda was going to be, have some sort of deal with the informant, Mr. X.O.L. Martinez. I don't think he even knew that. That's one interpretation. It's one interpretation. But the other interpretation is that he knew that the deal involved the drugs that were taken out of the van. You don't have a leap of faith to get to that conclusion. That is a reasonable conclusion from the facts. Do you not agree? Well, I think there's a leap of faith when you can't even show that he knew there were drugs in the van, and when you determine that, in fact, the drugs were in the van. But it shows that he has knowledge that there's a deal going down involving drugs, and he's there getting $100 from Pineda to wash his back and to counter surveil. Well, I think there's a presumption there that isn't supported by the evidence, which is that the drugs are in the van and that he had knowledge that there were drugs in the van. It's only ---- Well, Satchel tells him, we have seized the drugs out of the van, and he then changed his story with knowledge imparted by Agent Satchel. Well, change his story again is a characterization, a characterization by the ---- Well, I don't understand that Mr. Pineda had asked him to come along on the deal to make sure that nothing happened to Mr. Pineda. It doesn't stop by saying that he changed his story, and we have to imagine what he said. According to the agent, your client stated, after being confronted with the fact that they had seized drugs out of the van, that Mr. Pineda asked him to come along on the deal. I guess I just don't understand why they can't draw an inference. It's not the only possible inference, but I don't understand why it's not a rational inference that a jury should be permitted to make. A jury could certainly draw an inference such as that, but I'm saying that if you take a look at the totality of the facts and what was known to the agents at the time to the participants in the crime, given what we know, given what the agents were told in this approximately less than one-hour period of time total that they saw Mr. Reyes-Ponce, that, yes, the agents, let's face it, the agents are certainly there because they believe that a drug deal is going to go down. That's not a question. The question is, was Mr. Reyes-Ponce there because he knew that a drug deal was going to go down? And I'm submitting, and what I've argued, obviously, is that that's not the case, that if you take a look at all of the evidence, there's no indication or there's nothing to show that Mr. Reyes-Ponce himself had knowledge that, in fact, the deal, as he put it after confronted by Agent Satchel saying we found drugs in the car, was for a drug deal, that he knew that drugs were in the car. He certainly went so far as to say I was there, I was there on behalf of Mr. Salvador Pineda, I had a weapon, but he said nothing about knowing that drugs were involved. There was no – there's no evidence that he had knowledge that drugs were inside the car or the van. And that's the basic argument. That's the argument at this point in time. There's certainly no other. Roberts. Your argument is, up until the point of the interview, what Judge Bea and Judge Graber have said is that the argument, you know, has some force. Because you're right, there is no specific evidence, concrete evidence that he knew. But when you get to the trouble, this is, you know, that Judge Bea and Judge Graber have hit on the difficult issue for you. Well, the other problem, quite frankly, is with the nature of the interview itself, because in my recollection as trial counsel is I went into this with the officers, what we're getting is we're – number one, we don't have a recorded statement. Number two, we have the recollection of an officer who was questioning a person in a different language, English to Spanish, without an actual interpreter. Number three, we have that officer then passing the information on to a primary case agent who then wrote up the report that resulted in – But as the case reaches us here –  As I understand it, you have not assigned error to the admission of that testimony. That is in the record for our purposes without objection, correct? Yes. Yeah. I would have to agree with you on that. And it seems to me that the kinds of arguments you're making were available to be made to the jury, certainly. They actually were made to the jury, yes. But that's what juries are for. Right. I've used up my ten minutes, Your Honor. Thank you. We'll ask Ms. Royal to come discuss the other – the other matter. Thank you. We asked you a lot of questions, so we'll give you some rebuttal time. Thank you. May it please the Court, my name is Mary Ann Royal. I'm appearing on behalf of Mr. Balthazar Magellan. I will focus also on the sufficiency of the evidence issues primarily and reserve the sensing issue for the briefs and the questions on that. You'll have to keep your voice up. That is not a microphone. That does not amplify the sound. Okay. Can you hear me better? Yes, I can hear you now. Okay. My apologies. All right. In my client's case, there was no statement that he gave in terms of – that – from which knowledge or intent could have been gleaned. And in his case, there is – it was a viewing the evidence cumulatively, and in light of the most favorable – most favorably to the government, the evidence was insufficient to show that Balthazar Magellan either aided, abetted the possession of the drugs by Saldivar-Pineda or that he conspired to distribute them. I specifically focus on the elements of knowledge and content as they relate to the facts that were admitted at trial. In terms of aiding, abetting, it's important for the court to be mindful that the aiding and abetting was the possession of the drugs, not the distribution. All the steps taken in terms of the evidence that was admitted at trial for the possession were taken by Saldivar-Pineda alone. He negotiated with the conspirator. He arranged for the quantities. He received the samples. He distributed the quantities. I mean, he received all of the drugs himself, and he carried them himself in his own vehicle. The other four defendants were not in the vehicle with Saldivar-Pineda and the drugs at the time of the actual trip to the Azteca restaurant. Moreover, there was no proof of a joint venture since all of the underlying steps that were taken were done by Saldivar-Pineda between Saldivar-Pineda and the conspirator during the time that the possession was occurring. Can I ask you one thing? Yes, Your Honor. In one of the documents that the, or part of the evidence that was presented by the government in this case was the series of telephone calls between Baltazar Magana and Pineda. That was Exhibit Number 27. Correct. And on the two days in question, during the critical moments, there are just, you know, there are many telephone calls between these individuals. Your Honor's point is well taken, and I would refer you to the... So why, you know, why isn't that, that fairly strong evidence that the jury could infer that Baltazar well knew what was going on? Your Honor, it is weak circumstantial evidence because there's no recording of the telephone calls. There was no wiretap of the telephone calls. And I would refer, Your Honor, to the Rodriguez case, which is a Second Circuit case, but also Pinegos, where telephone calls in and of themselves do not establish the knowledge and intent sufficient to, for a conspiracy originating of any conviction. There has to be some knowledge of what actually transpired in those calls. And the fact that the calls occurred does not establish that. Was there any doubt in the evidence that Salvador Pineda was involved in the drug? That Salvador Pineda, there was no doubt that Salvador Pineda was involved because he facilitated the entire transaction with the confidential informant. In terms of my client... And you don't think the jury could infer from all these telephone calls that took place around the critical moments, the critical time periods... Well, referring... ...that your client had knowledge of what was going on? You could support an inference of that, but I don't think you can conclusively presume beyond a reasonable doubt that that was what happened. I would also briefly... Look, I want to stop you because you've used the word presumption or presume. And I'm not sure I understand that. The question is whether the circumstantial evidence was sufficient to allow a jury to find beyond a reasonable doubt. But they were not given any instruction on presumptions, were they? Your Honor, I – all right. The word was probably not well chosen. But from the fact that telephone calls are made, it cannot be concluded that that is evidence in and of themselves. There has to be some knowledge of the text of what happened in terms of the phone calls. Look, in previous cases where you have a drug case, usually there are pages and pages of transcripts or recordings of the context of the phone calls. And then you know, and some of the calls are about the drugs, some of the calls are about all kinds of other things. And unless you have the actual transcript of the calls or some other evidence to suffice, actually someone overhearing someone making the call or something like that, it is not sufficient. I would refer you to the Rodriguez case for that. The other evidence that the government claimed was proof was the fact that the presence of the van at the home of Saldivar-Pineda on two occasions and having that relate to the cocaine – causing that to support the inference that my client was the cocaine source or to prove that my client was the cocaine source. However, from the transcripts, that is not the case. For example, on January 13th, the timing of the arrival of the jeep and the arrival of the cocaine sources are not – do not match. And not only that, but I would say that Saldivar-Pineda – I mean, my client, Balthazar Magella, did not have a driver's license. The testimony from the motion hearings and also at trial was that one person was in the Jeep Cherokee. My client was never seen driving the Jeep Cherokee. He was never seen in the Jeep Cherokee. The Jeep Cherokee was – he was arrested in the Buick. And so for that reason, I would state that the evidence on that issue is insufficient also. If the Court has no questions, I would reserve the balance of the time. Kagan. You may do that. Thank you. We'll hear now from the government. Good morning, Your Honors, and may it please the Court. I'm Assistant United States Attorney Michael Dion representing the United States. Your Honors, I'll start by just making a couple of brief points about Mr. Reyes-Ponce's appeal. There's a couple of things that Appellant's counsel mentioned that I'd just like to quickly address. When the case agent interviewed Reyes-Ponce at the DEA headquarters, there was an interpreter. Not a professional interpreter, but there was a Spanish-speaking agent, a native Spanish speaker, who acted as an interpreter, and that was all part of the record at the trial court. Did that interpreter actually testify at the trial? Yes, he did. And he was cross-examined, and he testified that he interpreted for the conversation. The other critical point I want to make, and I think you've all correctly focused on the exact text of the agent's testimony, the first thing that he was asked was, did you ask Reyes-Ponce if he was involved in a drug deal? Yes, I did. He specifically questioned Reyes-Ponce about a drug deal. And so, you've got to look at all of Reyes-Ponce's responses in light of that. He wasn't asked about an arms deal or a real estate deal. He was asked by a DEA agent at DEA headquarters about a drug deal, and he said yes. I was involved in that deal. I was protection. And unless your honors have any other questions about Mr. Reyes-Ponce, I'll then turn to look at that. Up to that point, up to the interview, is it the government's position that there would still be sufficient evidence in the record to support the jury's finding? Up to that. Yes, I think there was, and I think the critical thing here is extensive evidence of direct contact with Sal Davar-Pineda. Reyes-Ponce knew exactly where to go and when to be there for this drug deal. He drove, he was the lead car that went there. Sal Davar-Pineda went separately. He drove to the exact spot of the deal, then he took up the surveillance position across the street. He's armed with a loaded gun. And there was expert testimony from the DEA case agent at trial that this is exactly the kind of behavior that you see from participants in drug deals, armed with loaded guns, counter surveillance behavior. So I think when you take all of that together, it does give rise to a reasonable inference that he knew that this was a drug deal. But- So it would support a jury's verdict beyond a reasonable doubt that he had knowledge of the conspiracy. I think- I think- The reasons of the conspiracy. Yes, Your Honor, I think it gives rise to a sufficient- Up to that point. To a sufficient inference, especially when coupled with the evidence. Was there any evidence that Reyes-Ponce was at the Balgozar Magallan house the day before the final meeting? On January the 12th, the day before the big meeting? No, there was no evidence that he met with Balgozar Magallan that day. He doesn't show up until January 13th, the day that's set for the big deal. Right before they go to the Azteca restaurant, is that correct? That's right, probably- He's seen driving the jeep. He's seen first sitting in the jeep when one of the agents drives into the parking lot of Balgozar Magallan's apartment complex and they see Reyes-Ponce sitting in the jeep. And then they all hang out there for a little while while the deal is finalized and Salvador Pineda is getting all his drugs together. And then they head off in this convoy over to the Azteca apartment. But they didn't see Reyes-Ponce participate in moving the drugs into the van or anything? No, Your Honor. He stayed in the car. Yeah, they didn't see that. Now, they had a very limited view because to be able to keep the complex under surveillance without being exposed, they really had to take positions where they could just see who was coming and going from the complex and they couldn't see what was going on in the lot. The only way they saw what was going on in the lot is that Special Agent Jewell made two very brief passes by the entrance to the lot and he looked around and that was when he testified that he saw the two meetings between the various conspirators inside the lot. Other than that, they couldn't see anything that was going on inside the complex. They could just see who was coming and going. If drugs were being loaded into the van, transferred, whatever, there was no way that they could have seen any of that. Now, turning to Mr. Baltazar-McGowan, as everybody has acknowledged here, I think the operative principle is that if you can draw a reasonable inference from the evidence, you must draw it in favor of the government and against the defendant when you're talking about a sufficiency of the evidence appeal. Now, the case against Baltazar-McGowan was absolutely a circumstantial case. And it has happened. The courts have looked at circumstantial cases in drug conspiracies and they have said there was not sufficient proof. Maybe the person was involved, but there was not sufficient proof that the person knew they were involved in a drug deal. Those cases are nothing like this case. Those cases usually involve people who sort of seem to be fringe players, peripheral players. The evidence at this trial, viewed in the light most favorable to the government, showed that Baltazar-McGowan was a central player in this drug deal. His hand, his fingerprints, I'm using that word figuratively, show up on all the critical moments of the deal. If you take a look at January 13th, the day that's set for the big drug deal. Early on that day, Salvador Pineda talks to the informant and he says, I'm getting together my drugs, I need to meet with my sources. Shortly after that, the white Jeep Cherokee registered to Baltazar McGowan's wife shows up at Salvador Pineda's house along with a second car, Honda Civic. And this is going to be the first of several appearances of that Jeep Cherokee. Now the agent saw Hispanic men getting out of those cars and going into Salvador Pineda's house. They couldn't say for sure whether, who those men were. But the fact that Baltazar McGowan's wife's car is showing up at that moment, and also coinciding shortly after a phone call between Salvador Pineda and Baltazar McGowan, strongly suggests some involvement by Baltazar McGowan. Now after the cars arrive at Salvador Pineda's house, the Honda Civic takes off, it's never heard or seen from again. And then everybody starts to head over to Baltazar McGowan's apartment complex. And his apartment complex is the central focus of the activity that morning. That's where all the conspirators are hanging out and meeting. That's where Salvador Pineda is, as he's telling the informant, I'm still trying to round up all the drugs. And remember, we're talking about three different types of drugs here. So we don't know if he's getting them all from one person, if he had to go to multiple sources. But it took him a little while to round up the drugs. Then we come to the matter of the phone calls. Your honors have mentioned on the 13th, the day of the big deal, there are 30 phone calls between Salvador Pineda, Baltazar McGowan, and Roberto Menino Loza. Menino Loza was the other man who was arrested in the car with Baltazar McGowan. How many are there between Salvador and Baltazar McGowan? It's directly between those two, it's smaller. I think it's roughly a dozen or so on that day. I think about 10 or 12 on that day. Now, it is of course true that we do not have the transcripts of those conversations. And defense counsel argues from that, that you can't infer anything from them. They're meaningless. And I would submit to your honor that when the defense counsel makes this kind of argument, it turns upside down two basic principles that this court applies when reviewing sufficiency of the evidence. The first is looking at the evidence in the totality of the circumstance. And the second is drawing reasonable inferences in the government's favor. Phone records come in as evidence in cases all the time, even when there's no recorded conversation. That's because it's well recognized that even if you don't have the text of the conversation, you can look at the circumstances. Who called who, at what time, and what else was going on? And you can draw reasonable inferences from that. And as I think our brief lays out extensively, these calls are occurring repeatedly at critical moments during the deal, and I'll get to a couple of those others. But to suggest that simply because standing alone, it's not conclusive proofs of knowledge, that that means that you toss the evidence aside, that is not the way the law works. Salazar Panetta eventually talks to the informant. He says, all right, I've got all the drugs together. I'm going to meet you over at the Azteca. We'll do the deal. And this is the point where everybody drives over to the Azteca restaurant. And Baltazar Magallan is riding in a car driven by Menino Loza. Baltazar Magallan is armed with a loaded .44 Magnum. Reyes Ponce and Bernal Jimenez, who are also both armed, are driving in the Jeep. That is again registered to Baltazar Magallan's wife. So his wife's car ends up being loaned to the two conspirators who are clearly going to be serving as armed muscle during the actual deal. Then they all drive up to the area of the Azteca restaurant. And they all do the same thing as they get there. The cars slow down when they reach the area where the informant is. The agents describe how the people in the cars, including Baltazar Magallan, look over in the informant's direction. As they pass him, they speed up and they continue north on Tacoma Mall Boulevard. And then what happens is the car with Reyes Ponce and Bernal Jimenez and the car with Baltazar Magallan and Menino Loza pull side by side and sit like that in a parking lot. They're in a position to have a conference. And in fact, if they were going to talk, that's how they have to do it because Reyes Ponce and Bernal Jimenez didn't have cell phones with them. So after having an opportunity to check out the layout and see what's going on where the deal's supposed to happen, those two cars pull directly side by side. And then they both take off from the parking lot. Reyes Ponce and Bernal Jimenez take up that sort of ideal surveillance post directly across the street. And for whatever reason, it's decided that there's no need for Baltazar Magallan and Menino Loza to be in the immediate area of the deal. So they drive back past the informant and they continue going south on the road and they basically leave the immediate area of the deal. And then shortly after that, the whole thing falls apart. Saldivar-Pineda realizes that the cops are following him. He calls the informant. He says the deal's off. I'm being followed. He calls Baltazar Magallan right after that. And defense counsel even admits from the timing of that call, you can infer what was said. You can infer that he's warning Baltazar Magallan. The cops are onto us. Get out of here. So there's just an example of how even the defense admits that you can draw a reasonable inference about what was said, even though you don't have the tape of the call. And at that point, Baltazar Magallan and Menino Loza flee. There's a high-speed chase. The cops eventually block them and stop them right before they get onto the freeway. Baltazar Magallan's arrested. He admits that the gun was his. He said, yeah, we knew you guys were following us. We knew the police were onto us. I tossed the gun in the back. This behavior is a lot more than a peripheral player in the deal. This person is central. His car being loaned out to the other conspirators, his car appearing when Salvador Pineda needs to get his drugs, his apartment complex being the central focus of the deal, the flight, the gun, all these things, the phone calls, suggest and certainly give rise to a reasonable inference that he knew that this was a drug deal. And those are just the events of the 13th. The events of the preceding day, January 12th, are arguably every bit as powerful. If you look at what happens on January 12th, that's the day that Salvador Pineda meets twice with the informant to give him the small drug samples. And the critical thing about that day is he met with the informant alone. No lookouts, no bodyguards. And so if the evidence showed that Baltazar Magallan is involved in the activity that day, then he's got to be more than just a lookout. He's got to have some role, at least beyond that. And I think what the evidence strongly suggests and certainly creates a reasonable inference of is that he's involved on the source side of the deal. Salvador Pineda has the first meeting with the informant where he gives him methamphetamine and heroin samples. And he says, I know I'm supposed to bring you a cocaine sample, but I don't have that yet. I need to meet with my source. I'll go meet with my source and then we'll meet up later that day. Salvador Pineda drives away from that deal. Minutes after driving away from handing over those samples, as he's presumably going to get the cocaine sample, he calls Baltazar Magallan. Salvador Pineda goes home, goes into his house. A few minutes later, the white Jeep shows up. The same one that we mentioned a couple times before. The one that was registered to Baltazar Magallan's wife. And right after, or basically at almost the moment that that Jeep shows up, there's a call from Salvador Pineda to the informant. My cocaine source just showed up. I'm going to come and meet you. I've got the drugs. Salvador Pineda heads off for the second meeting with the informant and gives him the cocaine sample. That white Jeep, driven by an unidentified Hispanic man, the agent was just too far away and couldn't say who it was, that white Jeep goes where? It goes back to Baltazar Magallan's apartment complex. Once again, we have phone calls that day. This time, we have 14 phone calls between the trio of Baltazar Magallan, Salvador Pineda, and Menino Loza. Now, there's no question about what Salvador Pineda's business on January 12th was. His business was getting the samples to the informant and setting up the big deal for the next day. And while he's doing that, we have this constant contact between him and Baltazar Magallan and Menino Loza, and we have Baltazar Magallan's white car showing up at that critical, critical moment in the events. Again, we're talking about, can the jury draw reasonable inferences? I think it's hard to argue that this does not, at the minimum, give rise to a reasonable inference that Baltazar Magallan knew what was going on, that he knew that this involved drugs. When you've got this degree, this extent of involvement, again, there's nothing like this in any of the cases where you see courts finding involvement but no proof of knowledge. If the court doesn't have any other questions about the facts, I do want to very briefly touch on the issue of the drug amounts. The defendant's argument on appeal is that the drug amount finding with regard to the conspiracy charge was improper because there was no finding that the amounts were reasonably foreseeable to Baltazar Magallan. And we concede that the court should have instructed the jury that the amounts were, or that they had to find what amount was reasonably foreseeable. That's true. But ultimately, it's irrelevant. And this is viewed under a plain error standard. So unless we have error that affects the defendant's substantial rights, there's no need to, for the court to do anything here. And this didn't affect his substantial rights because he was also convicted as an aider and a better. And as an aider and a better, he's automatically liable for the full amount. Reasonable foreseeability just doesn't apply. And we cited those cases from this circuit and others in our brief. And in the appellant's reply brief, there's simply no response to that. So I take it that that's not in dispute. And so at the end of the day, he got the mandatory minimum on the drug count of 10 years. So whether the conspiracy sentence stands or falls makes no difference because he still gets 10 years under the aiding and abetting sentence. Unless Your Honors have any further questions, that's all I have. Thank you very much. I don't believe that we do. Thank you. Both counsel may have some rebuttal time. And you can do it in the same order or in a different order, your choice. Ms. Royer, you actually have three minutes remaining to use. So you may use them all, and then we'll give some additional time to Mr. McKinney. Thank you very much. Hopefully, I won't need that amount of time. I would like to rebut specifically on the issue of the white Jeep. Which day? Well, both days, actually, Your Honor. On the 12th, my client did not have a driver's license. There was one person seen driving the white Jeep, and that person was not identified. But my client does not have a driver's license. He only had a identification card, for one thing. Would you start all over again? What is your point with respect to the white Jeep on both those days? Okay. The government is saying that because the white Jeep belonged to the common-law wife of my client, that somehow that meant that my client was responsible for whatever, if anything, occurred with the white Jeep. And first of all, I would state that only one person arrived at the house on the 12th. My client did not have a driver's license, and also he was not identified as being that person. On the 13th, I would say that there's a following chronology from the trial. The white ‑‑ Salvador Pineda had a white caravan, and then there was also a white Jeep. Okay. At 9.05 on the 13th, the white caravan was at Salvador Pineda's home. At 10 o'clock was supposedly the time for the deal. At 10.05, Salvador Pineda called the informant, saying he was waiting for his cocaine source. At some point, the white Jeep and a Honda Civic arrived, and three men were seen arriving at the home. At 10.20, the Jeep left. At 10.30, Salvador Pineda left. At 10.58, Salvador Pineda called the informant and said his cocaine source was late. At 11.50, Salvador Pineda left the complex. At 11.53, he returned with the cocaine, and then they all left at that point to drive to the Azteca. Therefore, there's no evidence that the white Jeep was the source of the cocaine on the 13th. That's all I have for rebuttal, unless there are any further questions from the Court. I don't believe there are. Thank you. And Mr. McPhee will give you two minutes. I guess we used a lot of your time. Just very quickly, I wanted to correct one statement made by Mr. Dion with regard to the facts, and that's with regard to the apartment. The testimony from DEA Special Agent Satchel was that he actually drove into the apartment complex itself, drove through the apartment complex, and saw the people around the car, some of whom were the people who were later on arrested. I actually went to that scene, and there is no way that it could have been seen from the road. You can't see the apartment complex from the road. I understand that's not in the record, but he actually drove through the complex. Mr. Dion, in his argument, also says that the cases cited in particular in my brief were talking about fringe players, people who were on the outside fringes of a dope deal. But I would submit to you that if you go back and look at the cases and look at United States v. Penagos, where the man clearly appeared to be a lookout, he saw boxes being transferred between cars. He's looking up and down the street. That's much more than just being on the fringe. If you take a look at United States v. Bautista-Avila, the people actually followed the drugs into the country from Mexico, and then were actually handling the money when the arrest went down. Again, more than just being fringe players. Last but not least, I'd like to address one more time the most serious problem for my case, for lack of a better word, which, of course, is the statement. And I would simply refer the court to Volume 4 of the transcript, page 600. Yes, it was Volume 4 of the transcript, page 600, where the testimony was that my client's statement, according to Special Agent Satchel from the DA, was my client stated, Francisco told him to get a gun and he'd get $100 if he watched Francisco's back during the deal. Despite the fact that my client was confronted with the fact that they found drugs in the car, he was consistent both before and after when he, quote, unquote, changed his statement. He said he did not know what was going on prior to the agent telling him about the drugs in the car, and after being told about the drugs in the car, my client did not say, I knew there were drugs in the car or that I was there to watch his back during the drug deal. So while it can be viewed as he simply forgot to put that in, I would submit to you that he was consistent throughout, both prior to and after being confronted about the fact that the drugs were in the car, that he did not know the drugs were in the car and refused to say that he had knowledge that drugs were in the car. Thank you. Thank you, counsel. The cases just argued are submitted, and we appreciate your helpful arguments by all counsel. With that, we stand adjourned for this session.
judges: Graber, Paez, Bea